UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

OCA, INC., ET AL.                          CIVIL ACTION

VERSUS                                     NO: 06-3228

KELLYN W. HODGES, D.M.D.,                  SECTION: R(3)
M.S., ET AL.


**ORDER AND REASONS**

Before the Court is defendants' Motion for Summary Judgment.

For the following reasons, the Court GRANTS the motion.


**I.    Background**

**A.    Factual Background**

This matter arises out of business relationship between a

private orthodontic practice, The Hodges Group, Inc., and its

provider of business, financial, and office management services,

Orthodontic Centers of America, Inc. (OCA).  OCA operates through

a network of wholly owned subsidiaries named according to the

states in which OCA does business (*e.g.*, Orthodontic Centers of

Pennsylvania, Inc.). Through its subsidiaries, OCA entered into long-term business service agreements (BSAs) with doctors in about 250 practices nationwide to provide office management and patient billing support, among other services. Under the BSAs, the doctors pay OCA a monthly fee based upon a percentage of their operating profit or practice revenue. The BSAs are OCA's primary asset and the source of nearly all of its revenue.

### B. Business Service Agreement

In 1995, Dr. Kellyn W. Hodges, an orthodontist with offices in Pennsylvania, entered into a Business Services Agreement[1] with OCA regarding Hodges' offices in Pennsylvania. (R. Doc. 58-2). The BSA has been amended three times, on September 8, 1997 (R. Doc. 58, Exhibit I), on September 4, 2000 (R. Doc. 58, Exhibit C), and on October 1, 2001. (R. Doc. 58, Exhibit J). In the BSA, OCA agreed to provide a range of business and administrative services in exchange for what is designated in the BSA as a "service fee."[2] Essentially, the arrangement was for OCA to take care of business functions so that the doctors could practice

---

[1] The original agreement is entitled "Business Management Agreement," but the amendments refer to the original agreement as the "Business Services Agreement."

[2] The fee was referred to as a "management fee" in the original agreement, but the amendments refer to it as a "service fee."

medicine free of administrative hassles. OCA was responsible for
(i) employment and training of administrative staff; (ii)
provision and maintenance of office space, furnishings and
equipment; (iii) bookkeeping and accounting services; (iv)
billing and collections services; (v) administration of the
practice's bank account and disbursement of funds therefrom;
(vi) installation of computer hardware and software, and training
staff on the utilization thereof; (vii) purchasing and management
of supplies and inventory; (viii) analysis of financial and
operational data on the practice's operations; (ix) legal
services for the practice's routine operations; and (x) provision
of a patient scheduling system. (BSA ¶¶ at 2.2-2.11).

OCA held exclusive control over Hodges' orthodontic revenues
and controlled the disbursement of funds from the practice's bank
account. (BSA at ¶¶2.10-2.11). In addition, although the
agreement said that the office equipment and furnishings were to
be under the "complete care, custody, and control" of Hodges, OCA
owned Hodges' office equipment and furnishings and leased these
items to Hodges. (BSA at ¶2.2). Further, OCA had Hodges' power
of attorney to negotiate managed care plans with preferred
provider organizations and health maintenance organizations,
which governed the amounts that Hodges would be reimbursed for
dental services by the insurers if he participated in such a

plan. (1997 Amendment to BSA at ¶1).

In the BSA, both parties agreed to covenants not to compete.
(BSA at ¶¶7.1-7.3). Specifically, OCA agreed not to affiliate
with more orthodontic practices within the "ADI," defined as the
broadcast coverage area of television and radio stations in
Cheltenham, Roxborough and the "All About Teeth" market area, as
defined by the Arbitron Ratings Company. (BSA at ¶¶2.9 and 7.3).
Hodges agreed that, during the term of the BSA, he and any
orthodontists employed by him would furnish orthodontic services
to the public in the ADI exclusively pursuant to the BSA. (BSA at
¶7.1). Hodges also agreed that for two years after the
expiration or termination of the BSA, the orthodontic entity
would not (1) solicit patients who were patients of the practice
during the term of the BSA and (2) would not solicit
orthodontists or center staff of the practice. (BSA at ¶7.1).
Hodges also agreed that, for two years after the end of the BSA,
any orthodontists in the practice would not provide services to
the public within a two mile radius of the practice's location,
unless they paid OCA a certain sum of money. (BSA at ¶7.2). The
BSA was to last for a term of 25 years. (2000 Amendment to BSA at
¶8). The BSA also contained a choice of law provision which
stated that the laws of Pennsylvania shall govern the validity
and interpretation of the agreement. (BSA at ¶9.5).

4

### C.    Service fee arrangement

Under the BSA, Dr. Hodges agreed to pay OCA a service fee in accordance with a formula.  The formula for the service fee was amended twice.  The current formula provides that the service fee is equal to:

(1) patient revenue, less

(2) 60% of the net operating margin.

(2001 Amendment to BSA at ¶2).

### D.    Procedural Background

On March 14, 2006, OCA and its subsidiaries filed for bankruptcy.  On May 23, 2006, OCA sued Dr. Hodges and the Hodges Group for breach of contract, promissory estoppel, specific performance, breach and default on promissory notes, conversion, unjust enrichment, quantum meruit, and account stated. (No. 06-1138 (B), R. Doc. 1).  Hodges counterclaimed for breach of contract and breach of fiduciary duty, and sought declaratory relief that the contract was invalid. (No. 06-1138 (B), R. Doc. 17).  On November 5, 2007, the Court issued an Order withdrawing the reference to the Bankruptcy Court. (R. Doc. 25).  Hodges now moves for summary judgment on the issue of whether the BSA is invalid and unenforceable under Pennsylvania law. (R. Doc. 58).

## II.  Legal Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex,* 477 U.S. at 325; *Lavespere,* 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex,* 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325;

*Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).


## III. Discussion

On December 30, 2008, the Court ruled that a similar BSA, between OCA and Dr. Warren J. Apollon, was illegal and unenforceable under Pennsylvania law. *See Warren J. Apollon, D.M.D., P.C. v. OCA, Inc.*, 592 F. Supp. 2d 906 (E.D. La. 2008). OCA does not dispute that the BSA at issue is substantially similar to the one between OCA and Apollon, but rather, essentially asks the Court to reconsider its decision in *Apollon*.


### A. Whether Pennsylvania's Professional Corporation statute prohibits a partnership between a dentist and a nonprofessional corporation

OCA first contends that the Court incorrectly determined that a partnership between a dentist and OCA violates the Pennsylvania Professional Corporation statute.

Pennsylvania common law generally prohibits the corporate practice of medical professions. *See Neill v. Gimbel Bros.*, 199 A. 178 (Pa. 1938) (holding that a corporation cannot practice optometry); *Practice of Chiroprody by Corporations*, 27 Pa. D. & C. 61, 1936 WL 8242 (Op. Att'y Gen. 1936) (corporation cannot

practice medicine, including chiprody).  But professional corporations composed entirely of professionals may be organized for the purpose of rendering professional services. 15 Pa. Cons. Stat. Ann. § 2903.  Only licensed persons may own shares in a professional corporation. 15 Pa. Cons. Stat. Ann. § 2923(a).  In *Apollon*, the Court determined that this statute also prohibited an unlicensed corporation from owning a share in a dental *partnership*.  Although OCA did not raise the issue in *Apollon*, OCA now argues that the plain language of the statute does not prohibit such an arrangement.

In construing statutes, courts attempt to ascertain and effectuate the intention of the General Assembly. 1 Pa. Cons. Stat. Ann. § 1921(a).  When the words of a statute are not clear, the court looks to:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

8

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

§ 1921(c). Courts employ a presumption "that the General Assembly does not intend a result that is absurd, impossible of execution, or unreasonable." 1 Pa. Cons. Stat. Ann. § 1922(1). Except as specifically provided in section 1928(b), statutes are to be "liberally construed to effect their objects and to promote justice." § 1928(c).

The General Assembly stated that its intent in passing the statute was "to authorize by this chapter licensed persons to render professional services by means of a professional corporation in all cases." § 2903(b). The history of professional corporation statutes provides further evidence to the legislature's intent. As explained by the Utah Supreme Court:

> Professionals traditionally practiced either as solo practitioners or in partnerships, but not as corporations because of ethical standards inconsistent with a corporate form of doing business. As a consequence, professionals were denied a wide variety of federal and state tax benefits available to others who could incorporate. . . professional practitioners lobbied state legislatures nationwide to enact statutes that would permit professionals to organize in a modified corporate form that would be recognized as a corporation for tax purposes *while leaving professional*

*ethical standards intact.*

*Berrett v. Purser & Edwards*, 876 P.2d 367, 372 (Utah 1994)
(emphasis added).  The court further explained that a
professional corporation is a "hybrid of the business corporate
form and the partnership form of doing business." *Id.*  This
history suggests that the Pennsylvania Professional Corporation
statute was passed not to contravene Pennsylvania's common law
prohibition on the corporate practice of medicine, but to allow
professionals to organize for tax purposes, while still
maintaining the same ethical standards held by solo practitioners
and partnerships.

A Pennsylvania Attorney General opinion, *Medical Partnership
Associations*, 25 Pa. D. & C.2d 29 (Op. Att'y Gen. 1961), further
supports this conclusion.  The opinion, written before the
passage of Pennsylvania's Professional Corporation statute,
discusses whether an association of physicians having various
corporate characteristics may be considered a corporation for tax
purposes. *Id.* at 30.  The opinion emphasizes that physicians may
organize in a modified corporate form, as long as the
organizations are "limited in membership to licensed physicians
who alone would direct the enterprise and share in the profits."
*Id.* at 36.  Such an association would not violate the common law

prohibition on the corporate practice of dentistry.  The Attorney
General explained:

> The element of lay control would thus be completely
> absent, and there would be no impairment of the
> personal physician-patient relationship. . . The
> physician in such an association, as in the case of an
> individual practitioner, would be solely responsible
> for his own conduct.

*Id.*

The Court concludes that the purpose of the Professional
Corporation Statute was to create a new type of entity that would
allow professionals to organize in a quasi-corporate form, that
is a hybrid of a partnership and a corporation, without violating
the rule against the corporate practice of medicine.  Because the
purpose of the statute was to create this new type of business
organization, that the statute does not explicitly mention
partnerships is not surprising.  But, since the statute was meant
to retain the ethical standards already applicable to solo
practitioners and partnerships, particularly the prohibition on
the lay practice of medicine, the Court may infer that the
ethical standards outlined in the statute are similarly
applicable to partnerships.  The statute prohibits an unlicensed
person from owning a share in a professional corporation.  The
Court thus holds that the statute also necessarily prohibits an
unlicensed person from owning a share in a dental partnership.

To hold otherwise would lead to absurd results, and the Court must employ the presumption against such an interpretation. Non-licensed persons could easily evade the statutory restrictions by organizing their entities as partnerships, limited liability companies, or limited partnerships, rather than corporations. Such an interpretation would neither remedy the mischief at issue — unlicensed persons having an ownership stake, and thus an influence, in professional business organizations — nor would it attain the object of the statute — the authorization of licensed persons to practice through professional business organizations.

Further, the Washington Supreme Court has rejected the same argument based on its substantially similar professional corporation statute. In *Morelli v. Ehsan*, 756 P.2d 129, 132 (Wash. 1988), the Court rejected an argument that the Washington Professional Corporation Act's explicit prohibition on the lay participation in a professional corporation indicated that, because there was no similar prohibition in the partnership context, a partnership between a lay person and a professional was acceptable. The Court explained that the Professional Corporation Act was a narrow exception to the common law prohibition on the corporate practice of dentistry and that "[i]t would be anomalous if, by simply structuring an organization as a

12

limited partnership, rather than a corporation, lay businessman could participate in a business that provided the same professional services." *Id.* This Court similarly finds such an arrangement untenable under Pennsylvania law. As such, because OCA is not a licensed person as defined by the statute, a partnership arrangement between it and Hodges would violate section 2923(a).

**B.  Whether the BSA created a partnership**

Pennsylvania law provides that a partnership is "an association of two or more persons to carry on as co-owners a business for profit." 15 Pa. Cons. Stat. Ann. § 8311. A partnership exists if there is a "clear, mutual assent on the part of two or more persons to form a partnership." *Leprino Foods Co. v. Gress Poultry, Inc.*, 379 F. Supp. 2d 650, 655 (M.D. Pa. 2005). A partnership may be implied from all attending facts and circumstances (*i.e.*, the manner in which the alleged partners conducted the business). *See id.; Murphy v. Burke*, 311 A.2d 904, 907 (Pa. 1972); *Gohen v. Gravelle*, 192 A.2d 414, 416 (Pa. 1963). The sharing of gross returns does not of itself establish a partnership. 15 Pa. Cons. Stat. Ann. §8312. But sharing profits is prima facie evidence of a partnership, unless the profits were received in payment:

(i) As a debt by installments or otherwise.

(ii) As wages of an employee or rent to a landlord.

(iii) As an annuity to a surviving spouse or representative of a deceased partner.

(iv) As interest on a loan though the amount of payment varies with the profits of the business.

(v) As the consideration for the sale of the goodwill of a business or other property by installments or otherwise.

15 Pa. Cons. Stat. Ann. § 8312(4); *see also Leprino Foods*, 379 F. Supp. 2d at 655 ("[a]n established pattern of profit and loss sharing may support a finding of partnership."). The burden of proof lies with the party seeking to prove the partnership. *Leprino Foods*, 279 F. Supp. 2d at 655 (citing *In re Jackson*, 28 B.R. 559, 563 (Bankr. E.D. Pa. 1983)).

OCA does not contend that its BSA with Hodges is substantially different from its BSA with Apollon. Rather, OCA asserts essentially the same argument that it asserted in *Apollon* — that the various disclaimers in the BSA prevent a finding that the agreement creates a partnership. The Court rejected this argument in *Apollon* and similarly rejects it here.

Although OCA asserts otherwise, OCA and Dr. Hodges were sharing profits. OCA's Service Fee was equal to the following

amount:

(i)  Patient Revenue; less

(ii) 60% of the Net Operating Margin.

(2001 Amendment to BSA at ¶2).  The Net Operating Margin means "the total amount of cash and cash equivalents collected in respect of orthodontic goods and services by or on behalf of the Orthodontist during the applicable period, less the Center Expenses for the applicable period." (2000 Amendment to BSA, Exhibit A).  Thus the Net Operating Margin is essentially Patient Revenues minus Center Expenses.  Center Expenses are the costs and expenses OCA incurred in its provision of services to the orthodontist. (2000 Amendment to BSA, Exhibit A).  OCA's reimbursement for Center Expenses is provided for in the calculation of the Service Fee. (BSA at ¶4.3).  The orthodontist's net revenues were to be 60% of the Net Operating Margin. (2001 Amendment to BSA at ¶3).

The agreement was designed to generate payments to OCA in excess of the costs it expended on the business ("Center Expenses"), otherwise it would make little business sense.  As the Court explained in *Apollon,* the fee OCA received under the formula was equal to 40% of the profits, plus its reimbursement for Center Expenses.  The Court will again demonstrate this as

follows.  The amount OCA received in excess of costs can be called OCA's net fee.  In the illustration, OCA's net fee is represented as x, Center Expenses as y, and Patient Revenue as z. Since the Service Fee was equal to Patient Revenue minus 60% of the Net Operating Margin, and the Net Operating Margin was equal to Patient Revenue minus Center Expenses, the Service Fee can be described as: z – 0.6(z – y).  The Service Fee included OCA's net fee plus its reimbursement for Center Expenses, and thus can also be described as: x + y.  This financial arrangement is represented by x + y = z – 0.6(z – y).  OCA's net fee (x) can be calculated with some simple algebra:

$$x + y = z - 0.6(z - y)$$

$$x + y = z - 0.6z + 0.6y$$

$$x + y = 0.4z + 0.6y$$

$$x \quad = 0.4z + 0.6y - y$$

$$x \quad = 0.4z - 0.4y$$

$$x \quad = 0.4(z - y)$$

Therefore OCA's net fee is equal to 40% of Patient Revenues minus Center Expenses, which means 40% of the Net Operating Margin. Thus OCA was receiving a 40% share of the practice's profits.

OCA now contends that this arrangement is not prima facie

evidence of a partnership since there are issues of material fact as to whether the profits were received in payment as a debt or as interest on a loan. *See* 15 Pa. Cons. Stat. Ann. § 8312(4)(i) and (iv). There is no evidence, however, that suggests the profits were received as such payments. OCA has pointed to no provision of the agreement or outside evidence to support this contention. The agreement contemplates that the profits are payment to OCA as a "Service Fee" for its management services — not as repayment for a debt or interest on a loan. (2000 Amendment to BSA, Exhibit A). Further, although any reimbursement of Center Expenses may be considered payment on a debt, OCA receives 40% of the profits *in addition* to its reimbursement for the money it expended on Center Expenses. It is unclear on which other debt the fee would be payment. OCA has simply not shown that a genuine issue of material fact exists as to whether the profits were paid in exchange for a debt or as interest on a loan. Thus the profit-sharing arrangement is prima facie evidence of partnership, *see* 15 Pa. Cons. Stat. Ann. § 8312(4). Since Hodges has established prima facie evidence of partnership, the burden of proof shifts to OCA to show that the arrangement was not a partnership. *See Demarchis v. D'Amico*, 637 A.2d 1029, (Pa. Super. Ct. 1994).

OCA has again failed to rebut the prima facie evidence of

partnership. To rebut defendants' contention, OCA relies on the provision in the BSA labeling the parties independent contractors (BSA at ¶8.2) and cites various cases holding that the intent of the parties governs whether their relationship is a partnership. The Court discussed two of these cases in its *Apollon* decision — *Kingsley Clothing Mfg. Co. v. Jacobs*, 26 A.2d 315, 317 (Pa. 1942) and *Kirshon v. Friedman*, 36 A.2d 647, 650 (Pa. 1944). In *Kingsley*, the agreement at issue provided that the parties did not intend to form a partnership relationship. But, as the Second Circuit noted, the other terms of the contract did not evince an intent to form a partnership. *See In re PCH Assocs.,* 804 F.2d 193, 198 (2d Cir. 1986) (finding that the terms of the contract in *Kingsley* were "not otherwise ambiguous"). For instance, in *Kingsley*, plaintiff and defendant entered into a contract under which plaintiff was to lease its coat manufacturing plant to defendants for the manufacture of 20,000 coats that defendants had contracted to make for the government. 26 A.2d at 316. In exchange for the use of its plant for this limited project, plaintiff was to receive one-half of the profit from the project. *Id.* The agreement was essentially a single transaction and did not establish a continuing relationship between the parties. *Id.* The only provision suggesting a partnership was the provision for profit sharing. Similarly in

*Kirshon*, the Court's only evidence of an intent to form a partnership was a provision entitling plaintiff to 25% of the company's profits.  The other evidence showed that he was an employee, rather than a partner. 36 A.2d 651.

In contrast, here, despite the BSA's disclaimer that the parties are independent contractors, the other provisions of the agreement show an intent to form a partnership.  OCA's ability to control and manage the business for a term of 25 years shows that OCA had an investment in the practice beyond that of an independent contractor.  Along with profit-sharing, co-ownership of a business is an indispensable requirement of a partnership. *Commonwealth by Zimmerman v. Sklenar*, 486 A.2d 1019, 1020 (Pa. Commw. Ct. 1985) (citing *Provident Trust Co. of Philadelphia v. Rankin*, 5 A.2d 214 (1939)).  Joint control of business decisions is a significant element in determining whether co-ownership exists. *See* J. William Callison and Maureen A. Sullivan, Partnership Law & Practice § 5.13 (2008).  Here, OCA has extensive control in managing the practice's business.  OCA controlled the practice's finances (BSA at ¶¶2.10-2.11) and all disbursements from the practice's bank account. (BSA at ¶2.11).  OCA had numerous other managerial responsibilities under the BSA.  OCA was responsible for employing office staff and administering the practice's payroll. (BSA at ¶¶2.3 and 2.10).  OCA was also

responsible for providing and maintaining office space and furnishings, marketing, and managing the center's inventory and supplies. (BSA at ¶¶2.2, 2.5, 2.8). OCA handled all bookkeeping tasks for the practice and all billing and collections. (BSA at ¶2.10). It maintained the insurance for the Center premises and equipment (BSA at ¶5.2) and had the power to negotiate managed care contracts with health maintenance organizations on behalf of the practice. (1997 Amendment to BSA at ¶1). OCA leased the practice's office space and provided the furniture and equipment for the office. (BSA at ¶2.2). OCA required the practice to be a "full time, active orthodontic practice." (BSA at ¶3.7). OCA also restricted the orthodontist's ability to practice outside of the agreement for the BSA's 25-year term and two years after the BSA ended. This non-compete provision demonstrates that OCA wanted to protect its economic interest in the joint enterprise, because a competing dental practice could endanger OCA's profits.

In reviewing a similar agreement the Fifth Circuit characterized it as follows:

> [T]he BSAs create an interlocking set of obligations
> that required OCA to exercise considerable control over
> the Orthodontists' practices. For instance, OCA
> conducted the financial and marketing activity of the
> practices, and it maintained the facilities, equipment,
> and support personnel required to operate the
> practices. The BSAs also stipulated how much each
> Orthodontist was required to work, and greatly
> restricted their ability to perform services outside of

the BSAs.  In exchange for these services, OCA charged
a fee that was tied to the profits of the practices.
The BSAs provide little to no ability for the
Orthodontists to oversee any of OCA's decisions related
to the practice.  Ultimately, the Orthodontists were
essentially only left with control over diagnosing and
treating their patients.

*In re OCA, Inc.*, 555 F.3d 413, 424 (5th Cir. 2008).  The Fifth

Circuit had little difficulty concluding that the BSA violated a

Texas statute prohibiting unlicensed persons from owning,

operating, or maintaining a dental practice. *Id.*  Similarly here,

OCA effectively operated and controlled the business aspects of

the practice.  OCA's degree of control over the practice and

share in its profits evidence a partnership relationship.

Further, the cases discussed, *supra*, stand for the principle

that "[w]hether the parties are in fact partners *inter sese* is a

matter of intention." *Ruth v. Crane*, 392 F. Supp. 724, 734 (E.D.

Pa. 1975).  But, as the Second Circuit has noted:

While the parties to a contract may intend that,
between themselves, their relationship is to be
governed by the label they affix, that label neither
governs the rights of third parties nor affects the
legal consequences of the parties' agreement.

*In re PCH Assocs.*, 804 F.2d at 198 (construing Pennsylvania law).

As the Court explained in *Apollon*, although the parties may not

consider their relationship a partnership, their understanding of

the relationship *inter sese* does not change the legal

consequences that flow from their agreement.  The parties may not
evade the dictates of the Pennsylvania Professional Corporation
statute by labeling themselves as independent contractors rather
than partners.  Since the BSA effectively creates a partnership
between a licensed orthodontist and an unlicensed corporate
entity, the agreement violates section 2923(a).

### C.    Severability and enforceability

The illegality of these contract provisions cannot be
severed from the other provisions of the BSA.  Under Pennsylvania
law, courts look to the intention of the parties to determine if
a contract is severable. *Jacobs v. CNG Transmission Corp.*, 772
A.2d 445, 452 (Pa. 2001).  The intent may be determined by
express language in the contract or from construction of the
agreement, including the nature of the consideration. *Id.*  The
character of the consideration may determine the severability of
the contract. *Jacobs v. CNG Transmission Corp.*, 332 F. Supp. 2d
759, 775 (W.D. Pa. 2004) (citing *Heilwood Fuel Co. v. Manor Real
Estate Co.*, 175 A.2d 880, 884 (Pa. 1961)).  It has been held that
if consideration cannot be apportioned, the contract is not
severable as a matter of law. *Id.* (citing *Canister Co. v. Wood &
Selick*, 73 F.2d 312, 313 (3d. Cir. 1934)).

Here, the BSA contains a clause providing that if a

provision of the agreement is held to be illegal, then it shall be severed from the agreement, leaving the remainder effective and binding upon the parties. (*See* BSA at ¶9.8).  But one of the provisions at issue here is the service fee arrangement — the entire consideration for OCA's management services under the contract.  Further, OCA has failed to identify any provision of the BSA that could be severed in order to reform the agreement. *See In re OCA,* 555 F.3d at 424 (finding that a severability clause did not save an OCA contract under Texas law since OCA failed to identify which provision of the BSA could be severed).  Accordingly, the BSA cannot be reformed.

Under Pennsylvania law, "an agreement which violates a provision of a statute, or which cannot be performed without violation of such a provision, is illegal and void." *Am. Ass'n of Meat Processors v. Cas. Reciprocal Exch.*, 588 A.2d 491, 495 (Pa. 1991) (quoting *Dippel v. Brunozzi*, 74 A.2d 112, 114-15 (1950)). "The law when appealed to will have nothing to do with it, but will leave the parties just in the condition in which it finds them." *Id.*  Here, OCA brought claims for breach of contract, promissory estoppel, specific performance, breach and default on promissory notes, conversion, unjust enrichment, and quantum meruit. (No. 06-1138 (B), R. Doc. 1).  Hodges brought claims for breach of contract and breach of fiduciary duty. (No. 06-1138

(B), R. Doc. 17).  All of these claims are premised on the
parties' illegal relationship created under the BSA and are thus
unenforceable.  Accordingly, the Court will leave the parties
where it found them.


**IV.  Conclusion**

For the foregoing reasons, the Court GRANTS defendants'
Motion for Summary Judgment.


New Orleans, Louisiana, this 19th day of March, 2009

_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE